IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COREY D. PALSON,                                )
                                                )
                 Plaintiff,                     )
                                                )
       vs                                       )    Civil Action No. 2:23-1941
                                                )
                                                )    Magistrate Judge Dodge
SUPERINTENDENT M. ZAKEN, et al.,                )
                                                )
                 Defendants.                    )

## MEMORANDUM OPINION

Plaintiff Corey D. Palson ("Palson"), who is incarcerated in the State Correctional Institution at Greene, Pennsylvania ("SCI Greene"), commenced this pro se civil rights action arising out of an incident in which prison officials told him they suspected he had hidden drugs in his body and placed him in a "dry cell" for four days. He named ten Department of Corrections ("DOC") employees at SCI Greene: Superintendent Michael Zaken; S. Buzas, (Deputy Facility Management); Security Corrections Officer I T. Johnson ("C.O. Johnson"); Security Lieutenant Stickles; Captain E. Hintemeyer; Captain Troyan; Sergeant Palmer; D. Varner (Chief Grievance Officer); Gale Rowe (Medical Staff); and R. Smith (Medical CHCA). Palson raised claims under the Fourth, Sixth and Eighth Amendments to the Constitution via 42 U.S.C. § 1983.

Defendants previously filed a partial motion to dismiss that was granted in part and denied in part. As a result, the remaining claims are raised under the Fourth and Eighth Amendments, and are asserted against Superintendent Zaken, Sgt. Palmer and C.O. Johnson.

Presently pending before the Court for resolution is the motion for summary judgment of remaining Defendants (ECF No. 54). For the reasons that follow, it will be granted in part and

denied in part.[1]

### I.    **Procedural History**

Palson initiated this action on November 9, 2023 by filing a motion for leave to proceed in forma pauperis. After he submitted the appropriate documents in response to a deficiency order, the motion was granted, and his Complaint was filed (ECF No. 8). Federal question jurisdiction is based on the civil rights claims asserted.

On May 28, 2024, Defendants filed a partial motion to dismiss (ECF No. 18). A subsequent Memorandum Opinion (ECF No. 32) and Order (ECF No. 33) granted the motion in part and denied it in part. Palson's Sixth Amendment claim and all claims against Defendants Varner, Rowe and Smith were dismissed with prejudice. Defendants Buzas, Stickles, Hintemeyer and Troyan were dismissed without prejudice and with leave to amend. Palson did not seek to amend the Complaint, however.[2]

Defendants then filed an Answer and the parties engaged in discovery. The remaining claims arise under the Fourth and Eighth Amendments and are asserted against Superintendent Zaken, Sgt. Palmer and C.O. Johnson.

On August 6, 2025, the remaining Defendants moved for summary judgment (ECF No. 54), which has been fully briefed (ECF Nos. 55, 64).

---

[1] The parties have consented to full jurisdiction before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF Nos. 22, 23.)

[2] As a result, Palson has not alleged any claims against Defendants Buzas, Stickles, Hintemeyer and Troyan, and they are now dismissed with prejudice.

## II.    Material Facts[3]

Zaken serves as the Superintendent at SCI Greene, Palmer is a sergeant at the institution and Johnson is a corrections officer. (Defendants' Statement of Material Facts Not in Dispute ("DSMF") ¶¶ 2-4) (ECF No. 56.)

It is the policy of the DOC to prohibit the introduction and presence of unauthorized weapons, drugs and other contraband that present serious threats to the security and proper management of a correctional facility. Accordingly, its policy provides for searches of facilities and inmates to control contraband and provide for its disposition. A random cell search will generally be performed by Search Team members assigned to the Security Office, but may be performed by other staff as directed by the Intelligence Captain/designee. A random search may be conducted at any time but no later than one hour after the facility is locked up for the evening (*Id.* ¶¶ 6-8.)

The use of a specialized K-9 to scan a cell to detect narcotics can be done without the presence of the assigned inmate. The K-9 scans the air to detect the possible presence of narcotics. If contraband is suspected, the proper procedure for a cell search will be followed. (*Id.* ¶ 9.)

The DOC policy also provides that a strip search may be conducted when necessary for the security and good order of the facility, including the following situations:

a. before and after every contact visit;

b. upon an inmate's return from outside activities, supervised outside leave, and furloughs;

c. upon reception, return from court, and return after the inmate has left the facility reservation for any reason;

---

[3] These facts are taken from Defendants' Statement. Palson did not submit a response to the Statement, although he did submit a response to the motion and a brief in opposition. Most of the facts are undisputed.

d. following an activity where an inmate has had the opportunity to mingle with outside groups, particularly where there are large numbers of people under minimal supervision;

e. periodically for an inmate who is permitted to move in and out of the gate areas;

f. when there is reason to believe that an inmate is in an escape plot or possession of contraband;

g. when an inmate enters or leaves any restricted area;

h. when an inmate is admitted/discharged from a Security Level 5 Housing Unit or Mental Health Unit; and

i. prior to being transported outside the secure perimeter.

(*Id.* ¶ 10.)

A body cavity search may be authorized by the Facility Manager/designee, when there is reasonable belief that the inmate is in possession of contraband and there is imminent danger to an inmate's health or facility safety, but only as a means of last resort. A physician will conduct all ordered body cavity searches of inmates. X-ray technology may also be used when there is reasonable belief that the innate is in possession of contraband. (*Id.* ¶ 11.)[4]

Palson has been incarcerated at SCI Greene since July 2, 2020. On September 9, 2022, Palson returned from morning yard to his cell at around 10:00 a.m. C.O. Johnson and other security officers entered Palson's cell with a K-9 dog who was being handled by Sgt. Palmer. Palson was strip searched in his cell, and after he got dressed, was escorted to the multipurpose room. Palson was taken to the multipurpose room for a strip search and the K-9 dog walked around Palson and made an alert. Sgt. Palmer told C.O. Johnson that the K-9 dog made an alert and C.O. Johnson informed Palson. (*Id.* ¶¶ 5, 15-17, 25.)

---

[4] Although Defendants provide information about various search procedures, the dry cell procedure is not described in any of their Policy Statements.

As a result of the alert, a body scan was performed on Palson twice, and he was informed that something was observed inside of his body. Palson has acknowledged that DOC employees suspected that he had drugs or contraband inside his body. (*Id.* ¶ 18.)

Because of the result of the body scan, an x-ray was subsequently performed. Palson was then escorted to a dry cell. (*Id.* ¶¶ 19-20.)

Defendants do not describe the conditions of a dry cell in their submissions. That said, as explained by the Court of Appeals for the Third Circuit, a dry cell is:

> a cell that lacks water. . . An inmate may be placed in a dry cell when prison staff have observed the inmate attempt to ingest an item of contraband or they learn that the inmate is attempting to introduce contraband into the prison. Dry cells are used to closely observe the inmate until natural processes allow for the ingested contraband to be retrieved. To this end, dry cells lack all linens and moveable items other than a mattress, inmates' clothes are exchanged for a simple smock, and their movements are carefully controlled to prevent them from concealing or disposing of any retrievable contraband.

*Thomas v. Tice*, 948 F.3d 133, 137 (3d Cir. 2020).

Palson testified that he was stripped naked and searched, then given a thin jumpsuit to wear. (Palson Dep. 16:18-25) (ECF No. 57 Ex. C.) He sat down on a stool and placed his forehead on a plastic desk in front of him. After a minute or two, he noticed that his forehead started to burn severely. (*Id.* at 18:1-5.) Then his hands started to burn inside the "kufbag" in which they were confined. (*Id.* at 18:13-18.) As a result of a burning sensation on his backside, thighs and testicles, he "realized that there was spray all over everything in this cell." (*Id.* at 18:19-23.) He told a corrections officer, but was informed that he "had not been sprayed" and nothing was done. (*Id.* at 20:4-6.)[5]

---

[5] Defendants state that Palson did not complain about these conditions, citing the medical records, which are not authenticated. (DSMF ¶ 30.) As explained in the text, however, Palson raised the issue three times in the record: (1) in his grievance, filed shortly after the incident; (2) in his verified Complaint (ECF No. 8 at 14), which is treated as an affidavit for purposes of resolving

According to Palson, someone came in with a hand-held camera to check on him approximately every two hours. He advised this person that there was oleoresin capsicum ("OC") spray residue all over the cell that was burning him and officers would not do anything about it. (*Id.* at 20:12-21:11.) *See also* ECF No. 8 at 6 (Palson described in the Complaint how the OC spray residue burned him); *id.* Ex. A (Palson raised this complaint in a grievance he filed about the incident); *id.* Ex. B (the prison's response to his grievance, stating that OC spray "was never administered" and that the cell was cleaned between usages).[6]

Palson was kept in a dry cell from September 9, 2022 through September 12, 2022. While there, a nurse checked on him approximately every two hours to check on his restraints, ask if he needed to use the restroom, offer an opportunity to exercise, drink water, and the option to urinate and/or have a bowel movement. Palson's restraints were checked and assessed throughout his duration in the dry cell. (DSMF ¶¶ 27-29.)

Palson produced two bowel movements on September 11, 2022. According to Defendants, Palson was scheduled to be x-rayed again the next day and the technician told him that the object that was inside of his body still did not move. (DSMF ¶¶ 21-22.) Palson testified, however, that the technician told him that the item "appeared to be in my bladder." (Palson Dep. 28:23.)

On September 12, 2022, Superintendent Zaken came into the cell and informed Palson that if he produced one more clean bowel movement, he would be released from the dry cell. Palson

---

Defendants' motion for summary judgment, *see Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 443 (3d Cir. 2020); and (3) in his deposition, which Defendants submitted as an exhibit to their motion.

[6] In his brief in opposition to Defendants' motion, Palson asserts that medical staff purposefully left this information out of his medical record and the video recording of his statements while in the dry cell was not provided to him. (ECF No. 64 at 2.)

produced a clean bowel movement and was released that day. Prior to this interaction, Palson did not have any communication with Superintendent Zaken. (DSMF ¶¶ 23-24.) In his deposition, he testified that he told Zaken that disagreed with the decision to keep him in the dry cell because "I had proved that I didn't do anything wrong, and that there was nothing inside me, that the X-rays proved that. And he said he still wanted me to provide another bowel movement." (Palson Dep. 29:19-22.)

## III.    Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Rsrv. Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Fam. YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

## IV.   Discussion

### A.  Section 1983 Claims

Palson's civil rights claims are asserted under 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). *See also Baker*, 443 U.S. at 140; *Graham v. Connor*, 490 U.S. 386, 394 (1989).

Palson's remaining claims are a violation of his Fourth Amendment right to be free from unreasonable searches and seizures, and violation of the Eighth Amendment, which prohibits cruel and unusual punishment, including conditions of confinement in prison.

### 1.  Fourth Amendment Claim

Defendants contend that Palson cannot maintain a claim under the Fourth Amendment because inmates have no right to be free from strip searches while in prison and he does not claim that the strip search was performed unreasonably. Palson responds that his claim does not relate to being strip-searched but to being placed in a dry cell and having his feces searched.

The Supreme Court "has confirmed the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests." *Florence v. Board of Chosen Freeholders*

8

*of Cnty. of Burlington*, 566 U.S. 318, 326 (2012). As the Court explained, its opinion in *Bell v. Wolfish*, 441 U.S. 520 (1979):

> is the starting point for understanding how this framework applies to Fourth Amendment challenges. That case addressed a rule requiring pretrial detainees in any correctional facility run by the Federal Bureau of Prisons "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." *Id.*, at 558, 99 S.Ct. 1861. Inmates at the federal Metropolitan Correctional Center in New York City argued there was no security justification for these searches. Officers searched guests before they entered the visiting room, and the inmates were under constant surveillance during the visit. *Id.*, at 577–578, 99 S.Ct. 1861 (Marshall, J., dissenting). There had been but one instance in which an inmate attempted to sneak contraband back into the facility. *See id.*, at 559, 99 S.Ct. 1861 (majority opinion). The Court nonetheless upheld the search policy. It deferred to the judgment of correctional officials that the inspections served not only to discover but also to deter the smuggling of weapons, drugs, and other prohibited items inside. *Id.*, at 558, 99 S.Ct. 1861. The Court explained that there is no mechanical way to determine whether intrusions on an inmate's privacy are reasonable. *Id.*, at 559, 99 S.Ct. 1861. The need for a particular search must be balanced against the resulting invasion of personal rights. *Ibid.*

*Id.* at 326-27. Based on its analysis in *Bell* and later cases, the Court held in *Florence* that a man arrested for a minor offense who was taken to two jails and subjected to invasive searches could not maintain a claim under the Fourth Amendment. *But see Parkell v. Danberg*, 833 F.3d 313, 329-30 (3d Cir. 2016) (prison policy of conducting thrice-daily body cavity searches on inmates who had been previously thoroughly searched and held in stripped-down isolation cells without human contact raised a Fourth Amendment claim).

The *Bell* Court stated that reasonableness must be determined by balancing the need for the search against the invasion of personal rights, as revealed by four factors: "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 441 U.S. at 559.

In this case, Palson had returned from outside the correctional facility where he could have interacted with others and obtained drugs. Based on the K-9 dog's alert, the x-ray and body scan,

9

prison officials had reason to believe that Palson had contraband inside his body.[7] As a result, they strip searched him and placed him in a separate dry cell room and waited for the contraband to be excreted. Given these considerations, the prison's actions were justified. Palson was placed in a dry cell that was separated from the view of others, and the scope of the intrusion and the manner in which it was conducted do not outweigh the invasion of Palson's personal rights.

Palson contends that he is challenging the dry cell procedures, not the strip search. However, courts have held that temporary placement in a dry cell for the purpose of searching an inmate's excrement for drugs does not violate the Fourth Amendment. *See, e.g.*, *United States v. Holloway*, 128 F.3d 1254, 1256 (8th Cir. 1997) (given the valid security interests of the prison, the dry cell procedures were found to be reasonable under the Fourth Amendment); *Hefa v. Hanratty*, 2021 WL 965451, at *7 (W.D. Wash. Jan. 13, 2021), *report and recommendation adopted*, 2021 WL 963480 (W.D. Wash. Mar. 15, 2021) (detention for 101 hours in a dry cell was "reasonably related to the legitimate penological purpose of finding concealed contraband.");[8] *Buckley v. Alameida*, 2011 WL 7139570, at *22 (E.D. Cal. Dec. 20, 2011), *report and recommendation adopted*, 2012 WL 368280 (E.D. Cal. Feb. 1, 2012) ("an x-ray followed by the contraband watch is a milder method of discovering the presence of contraband when compared to a rectal cavity search, a method which has been upheld as constitutional.")

---

[7] Palson's asserts that Sgt. Palmer lied about the dog alerting to the presence of contraband and none was later found. The fact that no contraband was found does not demonstrate that Sgt. Palmer was lying when he said the K-9 alerted. *See Thomas*, 948 F.3d at 137 (no evidence of contraband was found in any of Thomas's bowel movements, but this did not demonstrate that the guard lied when he said he thought he saw Thomas ingest contraband).

[8] The court in *Hefa* described the practice of keeping an inmate in a dry cell as a seizure, since no search was involved. Nevertheless, the court noted that a federally recognized interest in being free from unreasonable seizures exists under the Fourth Amendment. *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 682 (1985)).

Palson also contends that Defendants violated his Fourth Amendment rights when they searched his feces. The Court of Appeals has rejected this argument, however. Quoting from the district court's holding, the Third Circuit found that:

> Here, the search at issue concerned items removed from Bell's cell. No efforts were taken by prison officials to physically extract from ... Bell's person urine, feces, tissue or any other bodily fluid. Instead prison officials if I may be forgiven this lapse into cliche simply waited for nature to take its course. Accordingly, under *Hudson v. Palmer*, 468 U.S. at 526, 104 S.Ct. 3194, the search of the urine and feces removed from ... Bell's dry cell did not violate his rights under the Fourth Amendment because he possessed no legitimate expectation of privacy therein.

*United States v. Bell*, 27 F. App'x 133, 134 (3d Cir. 2002). *See also Drumgo v. Reese*, 2022 WL 4295442, at *16 (M.D. Pa. May 20, 2022) (relying on the Third Circuit's opinion in *Bell* to conclude that inmate had no privacy interest in searches of his urine and feces while in a dry cell and further concluding that prison officials did not violate his Fourth Amendment right to privacy by observing or filming him while he was in the dry cell), *report and recommendation adopted*, 2022 WL 3045310 (M.D. Pa. Aug. 2, 2022), *aff'd*, 2023 WL 7908030 (3d Cir. Nov. 16, 2023).

Given the valid security interests of the prison and K-9 dog's alert to the possible presence of contraband, and the results of the body scan and x-ray, Palson cannot demonstrate that use of dry cell procedures or the manner in which they were conducted violated his Fourth Amendment rights. Nor did Palson have a legitimate expectation of privacy with respect to the feces that he excreted while he was in the dry cell. As a result, his Fourth Amendment rights were not violated by Defendants.

Therefore, with respect to Palson's Fourth Amendment claims, the motion for summary judgment will be granted in favor of all Defendants.

2. <u>Eighth Amendment Claims</u>

Palson has two related Eighth Amendment claims. First, he contends that Defendants kept

him in the dry cell even after they no longer had a legitimate penological reason for keeping him there. He also contends that he was subjected to OC spray residue in the cell and complaints about being burned were ignored.

The Eighth Amendment "prohibits any punishment which violates civilized standards and concepts of humanity and decency." *Young v. Quinlan*, 960 F.2d 351, 359 (3d Cir. 1992), *superseded by statute on other grounds as stated in Nyhuis v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir. 2000) (citations omitted).

To prevail against prison officials on a claim that an inmate's conditions of confinement violated the Eighth Amendment, an inmate must meet two requirements: (1) the deprivation alleged must be, objectively, "sufficiently serious," and (2) the "prison official must have a sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). The first element is satisfied when an inmate is deprived of "the minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. 294, 299 (1991). The second element is satisfied when an inmate shows that prison officials acted with deliberate indifference to the inmate's health or safety or conditions of confinement that violated the inmate's constitutional rights. *Id.* at 302-03.

"The Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes, cannot be free of discomfort." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347.

a. Duration of Time in Dry Cell

As relevant here, the Court of Appeals in *Thomas v. Tice*, 948 F.3d 133 (3d Cir. 2020), held that "even though administrative confinement in a dry cell is unpleasant and often unsanitary,

so long as the conditions of that confinement are not foul or inhuman, and are supported by some penological justification, they will not violate the Eighth Amendment." *Id.* at 139 (citing *Young*, 960 F.2d at 364). In *Thomas*, after a guard indicated that he believed that he saw Thomas ingest contraband, he was immediately handcuffed and placed in a dry cell. Over the next four days, he had multiple bowel movements and an x-ray was also taken. No evidence of any contraband was found. On the fourth day, the Program Review Committee ("PRC") met and interviewed Thomas, after which it continued his confinement for five more days but provided no reason for this decision. The Third Circuit affirmed the district court's grant of summary judgment to the PRC members with respect to the specific deprivations Thomas suffered in the dry cell because there was no evidence that they were personally involved. *Id.* at 139.

At the same time, however, the Court of Appeals reversed the district court's grant of summary judgment in favor of defendants with respect to Thomas's challenge to the duration of his confinement in the dry cell, particularly since the PRC provided no basis for its decision that Thomas remain there for another five days. *Id.* at 139-40. *See also Jones v. Garman*, 2024 WL 4311476, at *7 (M.D. Pa. Sept. 26, 2024) ("the court finds in accord with the Third Circuit preceden[t] in *Thomas* that there is an issue of material fact regarding any continuing penological interest to justify Plaintiff's continued detention in the dry cell after the July 24, 2019 body scan. Therefore, this issue will continue past summary judgment.").

Defendants have established a penological interest in placing Palson in the dry cell in the first instance. But they have not conclusively established a basis for continuing to keep him there for another day and requiring another clean bowel movement after he had produced two clean bowel movements in three days and an x-ray improbably revealed that he had something "in his bladder."

In order to be liable under § 1983, each individual defendant "must have personal involvement in the alleged wrongdoing." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode*, 845 F.2d at 1207. These allegations must be made with appropriate particularity. *Id.* Further, "a civil rights complaint is adequate where it states the conduct, time, place, and persons responsible." *Evancho,* 423 F.3d at 353. Moreover, in a civil rights case, "liability cannot be predicated solely on the operation of *respondeat superior*." *Rode*, 845 F.2d at 1207.

The only named Defendant who is alleged to have required Plaintiff to remain in the dry cell for an unreasonable period of time is Superintendent Zaken. Defendants argue that Palson cannot state a claim against Superintendent Zaken based solely on his act of keeping Palson in the dry cell for an additional day until he produced another clean bowel movement. While they are correct that such a decision may well have been appropriate, Defendants failed to establish as a matter of law that it was justified. Simply put, they have offered no basis or explanation for Zaken's decision. Nor is there any record evidence to conclusively support a penological justification for keeping Palson in the dry cell after three days, two clean bowel movements and an x-ray showing that an object appeared to be "in his bladder." Thus, Defendants have failed to establish that the decision made by Zaken to continue Palson's confinement in the dry cell was based on a continuing penological interest. Without such evidence, the Court must conclude that Defendants have failed to establish that Superintendent Zaken is entitled to summary judgment with respect to Palson's Eighth Amendment claim.

As a result, Defendants' motion for summary judgment on this claim will be granted as to Palmer and denied as to Zaken.

14

b.   Exposure to OC Spray Residue

In support of their motion for summary judgment, Defendants argue that Palson's placement and conditions of confinement in the dry cell did not pose a substantial risk of harm and that there is no evidence that Defendants were deliberately indifferent to such a risk.

"The use of chemical agents to subdue recalcitrant prisoners is not cruel and unusual when reasonably necessary." *Gibson v. Flemming*, 837 F. App'x 860, 862 (3d Cir. 2020) (citation omitted). Here, however, Palson does not allege that OC spray was deployed. Rather, he asserts in the Complaint that OC spray residue was left in the dry cell and the "kufbag" from the last time it was used, and despite his complaints about sustaining burns as a result, Defendants took no action. If proven to be true, these conditions could support a claim that Plaintiff was subjected to the infliction of pain for no penological purpose, which would violate the Eighth Amendment. *See Hope v. Pelzer*, 536 U.S. 730, 737(2002) ("[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.").

Defendants do not squarely address this claim other than to contend that Palson did not make any complaints about OC spray on his clothes or himself. The evidence cited by Defendants is limited to the content of medical records which reflect no such complaints. However, this matter is disputed. As set forth in Palson's verified Complaint, he came in contact with OC spray residue, various portion of his body began to burn, the sensation was intense and severely painful, and he "cried and screamed" to medical staff and correctional officers, and they refused to do anything. (ECF 8 at 6.) He further claims that he dealt with this residue for the entire four days he was in the dry cell. Thus, he claims that he was subjected to the unnecessary and wanton infliction of pain to which Defendants were deliberately indifferent.

15

Thus, there are genuine issues of material fact about this claim.

As discussed, in order for a defendant to be liable for a civil rights claim, he must have been personally involved in the violation. Palson implicates "medical staff" and "C.O.s" in this claim. It is uncontroverted that Superintendent Zaken is neither part of the medical staff nor a correctional officer, and that he had no prior involvement with Palson before he made the decision to extend Palson's confinement in the dry cell. Similarly, according to Palson, Sgt. Palmer's involvement was limited to the search of Palson and allegations that he lied about the K-9 alerting to the presence of contraband. Thus, as neither had any role or involvement in Palson's claim related to his exposure to OC spray, both are entitled to judgment in their favor with respect to this Eighth Amendment claim.

Defendants have moved for summary judgment as to all three Defendants. However, their brief only addresses the lack of personal involvement of Zaken and Palmer and they do not discuss Johnson's personal involvement, or lack thereof. Indeed, there are extremely minimal references to Johnson in Defendants' submission.

As the record reflects, Johnson is a correctional officer. The uncontroverted record reflects that Palson identified Johnson by name as transporting him to the "multi-purpose room" for the strip search, transporting him to a body scanner, taking him to medical for an x-ray, and notifying Palson that he was going to be placed in the dry cell.

The Complaint references correctional officers who were allegedly involved in ignoring Plaintiff's requests for help. Johnson is not identified by name as one of those officers. At the same time, however, Defendants have not submitted any evidence that would conclusively establish that Johnson, who is a correctional officer, was not involved in this incident. It is their burden to do so as the moving party. As a result, while it is possible that Johnson was not one of the correctional

16

officers involved in this claim, Defendants have neither argued the lack of his personal involvement nor submitted any evidence that would establish that he was not one of these correctional officers. Therefore, while it will be Palson's burden at trial to establish any liability on the part of Johnson, Defendants have failed to demonstrate that Johnson is entitled to summary judgment on this claim.

Therefore, with respect to the Eighth Amendment claim concerning the OC spray, the motion for summary judgment will be granted in favor of Zaken and Palmer and denied with respect to Johnson.

## V.    Conclusion

For these reasons, Defendants' motion for summary will be granted as to all Defendants with respect to the Fourth Amendment claims. It will also be granted with respect to Eighth Amendment claims against Palmer, and with respect to the Eighth Amendment claim against Zaken regarding the conditions in the dry cell. The motion will be denied as to the Eighth Amendment claim against Zaken related to the duration of Palson's confinement in the dry cell and as to Johnson with respect to the claim regarding the OC spray conditions in the dry cell.

An appropriate order follows.

/s/Patricia L. Dodge

Dated: March 12, 2026                     Patricia L. Dodge
                                          United States Magistrate Judge

cc:    Corey D. Palson
       QP-6316
       SCI Greene
       169 Progress Drive
       Waynesburg, PA 15370

17